1              IN THE UNITED STATES BANKRUPTCY COURT

2             FOR THE SOUTHERN DISTRICT OF TEXAS

3                      HOUSTON DIVISION

4   IN RE:                    §     CASE NO. 20-35029-7
                              §     JOINTLY ADMINISTERED
5   THOMAS CALVERT SCOTT AND  §     HOUSTON, TEXAS
    TAMMI LYNN SCOTT,         §     TUESDAY,
6                             §     NOVEMBER 24, 2020
              DEBTORS.        §     11:09 A.M. TO 11:53 A.M.

7

8              341 MEETING OF CREDITORS (VIA ZOOM)

9                 CONDUCTED BY ALICIA BARCOMB
         TRIAL ATTORNEY FOR THE UNITED STATES TRUSTEE

10

11                  APPEARANCES (VIA ZOOM):

12  FOR THE US TRUSTEE:          OFFICE OF THE US TRUSTEE
                                 Alicia Lenae Barcomb, Esq.
13                               515 Rusk Street
                                 Ste. 3516
14                               Houston, TX  77002
                                 713-718-4650

15

16  FOR THE DEBTOR:              BAKER & ASSOCIATES, LLP
                                 Reese W. Baker, Esq.
17                               950 Echo Lane, Ste 300
                                 Houston, TX  77024
18                               713-869-9200

19

20              TRANSCRIPTION SERVICE BY:

21           JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22               Sugar Land, TX 77478
                    281-277-5325
23            www.judicialtranscribers.com

24

25     Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.
              No ERO present; no logs.

1    HOUSTON, TEXAS; TUESDAY, NOVEMBER 24, 2020; 11:09 A.M.

2         MS. BARCOMB:  Good morning, my name is Alicia

3    Barcomb and I am a trial attorney with the United States

4    Trustee's Office.  Today is Tuesday, November 24th, 2020 at

5    11:09 a.m.

6         This is the 341 meeting for Thomas and Tammi

7    Scott, Case No. 20-35029.  This case is jointly administered

8    with Case No. 20-35098, Maui Lifted Jeep Rentals.

9         And for the Record, this matter is being digitally

10   recorded and all parties are appearing by phone.

11        Mr. Scott, could you please identify yourself for

12   the Record?

13        MR. SCOTT:  Yes, ma'am.  This is Thomas Scott.

14        MS. BARCOMB:  And Mrs. Scott, can you please

15   identify yourself for the Record?

16        MRS. SCOTT:  This is Tammi Scott.

17        MS. BARCOMB:  Thank you, Ms. Scott.  And would the

18   Debtor's Counsel please identify yourself.

19        MR. BAKER:  Reese Baker.

20        MS. BARCOMB:  Thank you, Mr. Baker.

21        Mr. Scott, will you also be appearing as the

22   Debtor's representative for Maui Lifted Jeep Rentals?

23        MR. SCOTT:  I will, yes, ma'am.

24        MS. BARCOMB:  Thank you.

25        Okay and I do need to administer an oath to both

1    of you.  So I'll start with Mr. Scott.

2        (Mr. Scott sworn.)

3            MR. SCOTT:  I do.

4            MS. BARCOMB:  Thank you.

5        (Mrs. Scott sworn.)

6            MRS. SCOTT:  Yes.  I will.

7            MS. BARCOMB:  Thank you.

8            All right, so for the individual case, ordinarily

9    I would have the opportunity to review your driver's license

10   or photo id and your social security card.

11           Because I am not able to do that, I will confirm

12   with your counsel, Mr. Baker.

13           Mr. Baker, have you reviewed Mr. and Mrs. Scott's

14   driver's license or ID cards?

15           MR. BAKER:  Yes, I have.

16           MS. BARCOMB:  Do they bear a true and correct

17   likeness to the Debtors?

18           MR. BAKER:  They appear to, yes.

19           MS. BARCOMB:  Okay.  And Mr. Baker, have you

20   reviewed the Debtor's social security cards?

21           MR. BAKER:  Yes.

22           MS. BARCOMB:  And do the numbers on those cards

23   match the last four on the petition?

24           MR. BAKER:  Yes, they do.

25           MS. BARCOMB:  Okay, thank you.

4

1           All right.  So, Mr. Scott, just going to ask you
2   some preliminary questions here.  Are you currently
3   employed?
4           MR. SCOTT:  I am, yes, ma'am.
5           MS. BARCOMB:  And how are you employed?
6           MR. SCOTT:  I'm employed with Maui Lifted Jeep
7   Rentals.
8           MS. BARCOMB:  Okay.  And what's your position.
9           MR. SCOTT:  I'm the -- I'm really the general
10  manager.  I do all the social media stuff, the advertising,
11  all that kind of stuff.
12          MS. BARCOMB:  Okay.  Do you have any other sources
13  of income?
14          MR. SCOTT:  Not at this time, no, ma'am.  But I am
15  currently looking for another position as well.
16          MS. BARCOMB:  Okay.  And what type of work are you
17  looking for?
18          MR. SCOTT:  I spent my whole life in the car
19  business before I got to -- before we left and moved to Maui
20  open up companies.  So I've got 15 year' experience in auto
21  sales.
22          MS. BARCOMB:  Is that the type of work you're
23  looking for something possibly in auto sales?
24          MR. SCOTT:  It is, yes, ma'am.  I'm also expanding
25  that at this point because auto sales are down very much

1  right now.  There's not a lot of hiring going on in that

2  area.  So I'm expanding out to other sales avenues that I

3  can qualify for.

4          MS. BARCOMB:  Okay.  And Mrs. Scott, are you

5  currently employed?

6          MRS. SCOTT:  I am through Maui Lifted Jeep

7  Rentals.

8          MS. BARCOMB:  Okay, and what is your position?

9          MRS. SCOTT:  I do like the back office filing,

10  that sort of thing, answering phone calls when necessary.

11          MS. BARCOMB:  Okay, do you have any other sources

12  of income?

13          MRS. SCOTT:  I have been doing Instacart grocery

14  delivery.

15          MS. BARCOMB:  Okay.  How long have you been, I'll

16  say, working with Instacart?

17          MRS. SCOTT:  Probably about eight to nine weeks

18  now.  A couple months.

19          MS. BARCOMB:  Is that income steady or do you see

20  like some fluctuations?

21          MRS. SCOTT:  I'm sorry, can you repeat that

22  question?

23          MS. BARCOMB:  Sure.  I said is that income steady

24  or do you see some fluctuations?

25          MRS. SCOTT:  Oh, there's fluctuation, yes, ma'am.

1          MS. BARCOMB:  Okay.  All right.  Okay, regarding

2    Maui Lifted Jeep Rentals, does it have any other employees?

3          MR. SCOTT:  It does, yes, ma'am.  Spencer Wright

4    is on island.  He's my -- he's the guy that does all the

5    rentals and stuff right there on the island.  We're in Texas

6    ourselves.

7          MS. BARCOMB:  Okay.  So just the one employee?

8          MR. SCOTT:  One employee.  We are looking to hire

9    a car washer, so we might be adding one here shortly.  But

10   apparently there's one additional.

11         MS. BARCOMB:  Okay, I think you said his name was

12   Spencer Wright; is that correct?

13         MR. SCOTT:  That is correct, W-R-I-G-H-T.

14         MS. BARCOMB:  Okay.  Is Mr. Wright a W-2 or a

15   contract employee?

16         MR. SCOTT:  W-2.

17         MS. BARCOMB:  Okay.  Prior to the filing of the

18   Maui case, was that Debtor current on its employee wage

19   obligations?

20         MR. SCOTT:  Yes, ma'am.  We didn't have wage

21   obligations before that point.

22         MS. BARCOMB:  Okay.  And considering the time

23   since the petition was filed, is Maui -- when I say Maui I

24   am referring to, of course, Maui Lifted Jeep Rentals.  Is

25   Maui current on its post-petition employee withholding

1  taxes?

2            MR. SCOTT:  Yes, ma'am.

3            MS. BARCOMB:  So it kind of sounds like that --

4            MR. BAKER:  Alicia?

5            MS. BARCOMB:  Sure.

6            MR. BAKER:  Yeah, it just kind of for a summary.

7  You know, Hawaii closed down.  They were over running the

8  business.  Left Hawaii, came back here and it was shut down

9  for I don't know five or six months until October 17.

10            MR. SCOTT:  Seven.

11            MR. BAKER:  And yeah, so realistically, nothing --

12  I think correct me on this -- but I don't think anything

13  really happened.  There was some very minor, minor stuff

14  with the business until Hawaii reopened.

15            MS. BARCOMB:  Thanks.

16            MR. BAKER:  Is that correct?

17            MR. SCOTT:  That's correct, Reese.  We had a

18  couple locals every now and then maybe once a week that

19  rented Jeep for 100 to 200 bucks for a couple days.  So that

20  was it.  So he was there to kind of babysit that part of it.

21  And he also owns a jeep lot on island, so we kind of put our

22  stuff together so he could cancel his lot and all that stuff

23  and he put his jeeps in our lot.  We kind, you know, he was

24  helping us out earlier doing that kind of stuff, so.

25            MS. BARCOMB:  Okay, thank you.  That was going to

1  me next, I guess, line of questioning.

2         So did Mr. Wright earn any wages prior to the

3  filing?

4         MR. SCOTT:  He did not, no, ma'am.

5         MS. BARCOMB:  Okay.  Is he now earning employee

6  wages?

7         MR. SCOTT:  He is, yes, ma'am.  As of

8  October 15th.  When his company opened up he put everybody

9  back on payroll.

10        MS. BARCOMB:  Okay.  Does he earn an hourly wage

11 or a salary?

12        MR. SCOTT:  Salary.

13        MS. BARCOMB:  Did you say hourly?

14        MR. SCOTT:  Salary, $2500 a month.

15        MS. BARCOMB:  Okay.  Sorry.  Okay.

16        All right, so what caused the filing of these

17 bankruptcies?

18        MR. SCOTT:  So like Mr. Baker just said, you know,

19 with the companies in Hawaii, in the middle of March at some

20 point -- I want to say it was around the 14th or so --

21 Hawaii shut down tourism completely, basically.

22        They said that nobody could come without a 14-day

23 quarantine when they land on the island.  So, you know,

24 vacationers won't come before because they're going to for

25 seven to 10 days typically.  So tourism dropped

1   95-99 percent over the last seven months.

2        It is back as of October 15th with a negative

3   COVID test.  So within three days of arrival as long as you

4   have a negative COVID test, you can show up.  But a lot of

5   people are kind of getting, you know, messed up and they're

6   making a lot plans and then somebody in the family come up

7   with COVID, and they can't come.

8        So it's -- you know, I think I saw, the last I saw

9   was the island is back up to 20 to 25 percent capacity right

10  now.  And lucky for us, you know, we're a local company.

11  So, you know, people right now are buying homes so they're

12  buying for us instead of enterprise, I think.  So, we've had

13  a decent come back.  We're pretty sure we're going to make

14  it just fine.

15        MS. BARCOMB:  Okay.  All right.  And what has been

16  your understanding of how you-all will exit this bankruptcy?

17        MR. SCOTT:  So I believe we're going to, you know,

18  be renegotiating the debts on the Jeeps.  The evaluations,

19  you know, coming together with a new plan.  And then we're

20  going to, you know, right about the time we had this thing

21  out of plan is, you know, we've got the vaccine coming up,

22  so we expect that Hawaii is going to go back to full force

23  within the next six to 12 months.  You know, it may be nine

24  to 12 months at the most.

25        So I think our plan that we're going to come up

1    with is going to work very well.  You know, we'll lower our

2    expenses just a little bit and I think we'll do great.

3              MS. BARCOMB:  Okay.  And I believe you said that

4    you and Mrs. Scott moved from Hawaii to Texas.  When did

5    that happen?

6              MR. SCOTT:  It was May 8th.  It was when we ran

7    out of money.  So, we had to come home.  We came home, we

8    lived with family and, you know, we came back with nine

9    suitcases with us.  Sold all our possessions.  We really had

10   nothing.  Like we had no money, we had no possessions, we

11   had nine suitcases' worth of clothes for me and my wife and

12   my son.  And that was May 8th.

13             MS. BARCOMB:  Okay.  And you mentioned selling

14   everything before you moved here.  Did you-all own a house

15   in Hawaii?

16             MR. SCOTT:  We didn't own a house, no, ma'am.

17   They are way too expensive.  That scared me a lot.  The

18   Florida condo thing in Hawaii, I just feel like the real

19   estate was bound to bust and it's like it probably is right

20   now.

21             So we didn't own a house, but you know our

22   furniture, we had a couch, we had a couple beds.  You know,

23   we had the TV.  You know everything that was inside the

24   house basically, pots and pans, we just had to liquidate

25   everything to get off island.

1          MS. BARCOMB:  Okay, were you-all renting the place

2   where you-all were living?

3          MR. SCOTT:  We were, yes, ma'am.

4          MS. BARCOMB:  Okay.  Are you currently still

5   residing with family?

6          MR. SCOTT:  No, ma'am.  We have our own house now.

7   It was fully furnished.  When we got back, it was a perfect

8   place for us.

9          MS. BARCOMB:  Okay.  So, you had a rental in

10  Hawaii and now you're living in a rental in Texas; is that

11  correct?

12         MR. SCOTT:  That's correct, yes, ma'am.

13         MS. BARCOMB:  Okay.  All right.  Okay, so I'm

14  going to ask you just a few questions about the petition

15  that was filed in both cases, the Schedules that were filed,

16  and the Statements of Financial Affairs.

17         Do you-all have access to those documents?

18         MR. SCOTT:  I have both files.  I don't have my

19  financial affairs paperwork in front of me, but I do have

20  both Schedules.

21         MS. BARCOMB:  Okay.  So, let me look at --

22  Mr. Baker, I did want to ask you one question about the

23  individual bankruptcy.  Did you intend to re-amend the

24  petition to add Ms. Scott or?  I know that that amended

25  petition was struck.  Were you going to file another one or

1  just leave it as the Court's Order granting that motion?

2       MR. BAKER:  Yeah, I guess we probably ought to

3  amend the petition.  I hadn't thought about that because

4  we'd done it -- we'll go on and get an amended petition on

5  file.

6       MS. BARCOMB:  Okay.  Thank you.

7       MR. BAKER:  I have the documents.

8       MS. BARCOMB:  Okay.  So, Mr. Scott, the petition

9  that I have in your individual case only bears your

10  signature on it, so I'm just going to ask some questions

11  about this document first.

12       And I believe, is that also true of the business?

13  No, Mrs. Scott, you signed the business petition; is that

14  right?

15       MR. SCOTT:  I believe she signed it, yes, ma'am.

16       MS. BARCOMB:  Okay, excellent.  All right, so

17  we'll start with Mr. Scott, I'm going to ask you some

18  questions about the individual case first.

19       Mr. Scott, did you sign the Petition, Schedules,

20  Statements and related documents?  And is the signature your

21  own?

22       MR. SCOTT:  Yes, ma'am.

23       MS. BARCOMB:  Did you read the Petition,

24  Schedules, Statements and related documents before you

25  signed them?

1          MR. SCOTT:  I did, yes, ma'am.

2          MS. BARCOMB:  Are you personally familiar with the

3  information contained in the Petition, Schedules, Statements

4  and related documents?

5          MR. SCOTT:  Yes, ma'am.

6          MS. BARCOMB:  To the best of your knowledge, is

7  the information contained in the Petition, Schedules,

8  Statements and related documents true and correct?

9          MR. SCOTT:  Yes, ma'am.

10          MS. BARCOMB:  Are there any errors or omissions to

11  bring to my attention at this time?

12          MR. SCOTT:  Not to my knowledge.

13          MS. BARCOMB:  Okay.  Are all of your assets

14  identified on the Schedules?

15          MR. SCOTT:  Yes, ma'am.

16          MS. BARCOMB:  Did you list all of your creditors

17  on the Schedules?

18          MR. SCOTT:  Yes, ma'am.

19          MS. BARCOMB:  And have you previously filed

20  bankruptcy?

21          MR. SCOTT:  I have, yes, ma'am.  Maybe -- I think

22  I filed a Petition somewhere -- I think it's like 12, 14

23  years ago possibly, a Chapter 7 personally.

24          MS. BARCOMB:  Okay.  I show a 2008 case.  Does

25  that sound correct?

1          MR. SCOTT:  Yes, ma'am.

2          MS. BARCOMB:  Okay.  And you said that was a

3 Chapter 7 case?

4          MR. SCOTT:  That's correct.

5          MS. BARCOMB:  Okay, and did you receive a

6 discharge in that case?

7          MR. SCOTT:  I did, yes, ma'am.

8          MS. BARCOMB:  Did you and your wife file jointly

9 or did you just file on your own?

10          MR. SCOTT:  It was from a previous divorce, so she

11 was not involved yet.

12          MS. BARCOMB:  Okay.  I understand.

13          MR. SCOTT:  She was not in it.

14          MS. BARCOMB:  Okay.  All right and then -- okay,

15 so Mrs. Scott, if I recall correctly on the Schedules, you

16 signed the Schedules in the individual -- when I say

17 individual, I mean you-all's personal case.

18          And then it looks like you also signed the

19 Schedules for Maui.  Is that your understanding, Mrs. Scott?

20          MRS. SCOTT:  Yes.

21          MS. BARCOMB:  Okay.  So when I ask you these

22 questions, I'm referring to those two documents

23 collectively, okay?

24          MRS. SCOTT:  Okay.

25          MS. BARCOMB:  Okay.  You're going to get the same

1  questions.  Here we go.

2          Mrs. Scott, did you sign the Petition in the Maui

3  case, the Schedules, Statements and related documents in

4  both cases?  And is the signature your own?

5          MRS. SCOTT:  Yes.

6          MS. BARCOMB:  Did you read the Petition,

7  Schedules, Statements and related documents before you

8  signed them?

9          MRS. SCOTT:  Yes.

10          MS. BARCOMB:  Are you personally familiar with the

11  information contained in the Petition, Schedules, Statements

12  and related documents?

13          MRS. SCOTT:  Yes.

14          MS. BARCOMB:  To the best of your knowledge, is

15  the information contained in the Petition, Schedules,

16  Statements and related documents true and correct?

17          MRS. SCOTT:  Yes.

18          MS. BARCOMB:  Are there any errors or omissions to

19  bring to my attention at this time?

20          MRS. SCOTT:  Not to my knowledge, not at this

21  time.

22          MS. BARCOMB:  Okay.  Are all of Maui's assets

23  identified on the Schedules?

24          MRS. SCOTT:  Yes.

25          MS. BARCOMB:  Did Maui list all of it's creditors

1  on the Schedules?

2          MRS. SCOTT:  Yes.

3          MS. BARCOMB:  And have you personally filed

4  bankruptcy before?

5          MRS. SCOTT:  No.

6          MS. BARCOMB:  Okay.  Has Maui previously filed

7  bankruptcy?

8          MRS. SCOTT:  No.

9          MS. BARCOMB:  Okay, thank you.

10         Okay, and when was Maui formed?

11         MR. SCOTT:  The initial form is a LLC was December

12  of 2017.  We opened for business in January of 2018.

13         MS. BARCOMB:  Okay, was Maui formed in Hawaii or

14  in Texas?

15         MR. SCOTT:  We did it from Texas in Hawaii.  We

16  filed on one of Hawaii's websites so it was filed in Hawaii.

17         MS. BARCOMB:  Okay, so it's a Hawaii --

18         MR. SCOTT:  It's a Hawaii LLC.

19         MS. BARCOMB:  Perfect.  Okay.  And did you-all

20  provide a certificate of good standing to the US Trustee

21  regarding that entity?

22         MR. SCOTT:  I believe we did.

23         Reese, did we, correct?

24         MR. BAKER:  I think we did.  We have one. I

25  thought we had sent it to you.  If not, we can send it to

1   you.

2          MS. BARCOMB:  Just confirm that.  Hold on.

3          Yeah, Reese, if you wouldn't mind just sending

4   that again.  I don't see it in the file.  So that would be

5   helpful to have.

6          MR. BAKER:  Sure, I'll do that.

7          MS. BARCOMB:  Thank you.

8          All right.  Mr. Scott, are all of yours and

9   Mrs. Scott's assets insured?

10          MR. SCOTT:  We don't personally have any insurable

11   -- the vehicles that we have are insured under the company

12   policy, that's correct.  Other than that, we don't have any

13   insurable assets.

14          MS. BARCOMB:  Okay, so the vehicles that you and

15   Ms. Scott drive here in Texas, are those insured?

16          MR. SCOTT:  They're insured, yes, ma'am.

17          MS. BARCOMB:  Okay.  And then are the vehicles of

18   the company also insured?

19          MR. SCOTT:  They are, yes, ma'am.

20          MS. BARCOMB:  Okay.  And have you added the US

21   Trustee as a party of notice to those insurance

22   certificates?

23          MR. SCOTT:  We have, yes, ma'am.

24          MS. BARCOMB:  Okay.  Reese, I don't know if you've

25   had an opportunity to send that over as well, but I'm not

1  seeing it in the file.

2       MR. BAKER:  Okay, I thought we sent that over.

3  I'll send that to you.

4       MS. BARCOMB:  I appreciate it, thank you.

5       Okay, and if I recall correctly, Mr. Scott, the

6  Debtors were attempting to establish a Debtor-In-Possession

7  bank account at -- was it Chase Bank; is that correct?

8       MR. SCOTT:  We tried Chase Bank, we've tried

9  Capital One, we've tried Wells Fargo and none of them can

10 figure out how to open it correctly because they cannot put

11 the EIN in there.

12      MS. BARCOMB:  Okay, is that for your personal

13 account or for the account of the company?

14      MR. SCOTT:  For the personal account.  For the

15 company account, we have all kind of direct deposits, direct

16 stuff from our website and all that stuff.  I think that we

17 had talked about not putting a DIP on that one.

18      MS. BARCOMB:  Okay, so the US Trustee's position

19 is that all pre-petition bank accounts must be converted

20 into Debtor-in-Possession accounts.  If I recall correctly,

21 from the motion filed by your counsel, the issue was whether

22 or not you-all would be able to use debit cards, which --

23      MR. SCOTT:  That was for our personal, yes, ma'am.

24      MS. BARCOMB:  Okay.  I believe the motion also

25 referenced a debit card for Maui Lifted Jeep Rentals.  So we

1  will request that pre-petition bank accounts be closed and

2  that Debtor-in-Possession bank accounts be established.

3        I understand that if there is an issue with that,

4  we can definitely revisit it.

5        MR. SCOTT:  Okay.

6        MS. BARCOMB:  But just be aware of the US

7  Trustee's position on that.

8        MR. SCOTT:  Thank you.

9        MR. BAKER:  Okay, we're going to go on and file a

10  motion to allow them to continue to use their bank accounts

11  because none of the banks you-all are recommending will

12  comply or help out.  They've basically told them they won't

13  do it.

14        MS. BARCOMB:  Okay, thank you.

15        MR. BAKER:  I don't --

16        MR. SCOTT:  Okay.

17        MS. BARCOMB:  So is the Bank of Hawaii account for

18  Maui Lifted Jeep Rentals still an open and active account?

19        MR. SCOTT:  It is still open, yes, ma'am.

20        MS. BARCOMB:  And where is your personal bank

21  account?

22        MR. SCOTT:  My personal one is Capital One.  My

23  wife's personal one is Chase.

24        MS. BARCOMB:  Okay.

25        MR. SCOTT:  I've basically shut down mine.  I can

1  shut down mine and use my wife if that makes a difference,

2  but it don't matter to us really.  Just consolidating.

3          MS. BARCOMB:  So, the US Trustee's position is

4  that there is one Debtor-in-Possession bank account.  But

5  I'll let you discuss that with your counsel.

6          MR. SCOTT:  Fair enough.

7          MS. BARCOMB:  So I do see the Bank of Hawaii

8  account on here under your personal bankruptcy ending in

9  8245.  Do you still have that account open?

10          MR. SCOTT:  I believe that is the number to our

11  business account.  That sounds correct.

12          MS. BARCOMB:  So the business account has the last

13  four of 4325.  Did you have two accounts with Bank of

14  Hawaii?

15          MR. SCOTT:  4325 is the business account.  That's

16  a correct.  Was there a different account that you just gave

17  me?  I'm sorry.

18          MS. BARCOMB:  Yes, 8245 is listed on the personal

19  Schedules.

20          MR. SCOTT:  Okay, so that was my personal account.

21  That one is closed.  That was my personal one in Hawaii.  We

22  did close that one.

23          MS. BARCOMB:  Okay.  And where did you transfer

24  those funds?

25          MR. SCOTT:  Capital One.  Well, there was no funds

1  in there to transfer.

2          MS. BARCOMB:  Okay.  So I do see the Capital One

3  account on here.  And I believe you said your wife also has

4  a Chase account; is that correct?

5          MR. SCOTT:  That's correct.

6          MS. BARCOMB:  Okay.  So the Chase account is not

7  listed in your Schedules.  Is there any reason for that?

8          MR. SCOTT:  No.  I kind of thought that we did,

9  but maybe we didn't.  Apparently (indiscernible) now, but if

10  you're saying it's not there, I want to take your word for

11  it because you know where it is.  It's oversight at best.  I

12  apologize.  I really thought we did that.

13          MRS. SCOTT:  Do I need to give you that

14  information now or do we need to update something?

15          MS. BARCOMB:  We would request a formal amendment

16  to this Schedules to add that account.  But I am going to

17  ask you some questions about the Chase account.  Just, what

18  is the balance of that account?

19          MRS. SCOTT:  If you will give me one second.  It's

20  about $900.

21          MS. BARCOMB:  Okay, and approximation is fine.

22          MRS. SCOTT:  Okay.

23          MR. SCOTT:  So originally we filed the Schedules,

24  I filed first.  I think I just put my two banks on there.

25  And whenever we added Tammi, I think I didn't get that added

 1  to it.

 2          MS. BARCOMB:  Okay.

 3          MRS. SCOTT:  Okay, the account is $875.25.

 4          MS. BARCOMB:  Okay, that's the current balance?

 5          MRS. SCOTT:  That is correct.

 6          MS. BARCOMB:  Okay, thank you.

 7          Okay, Mr. Scott, how many Jeeps are used by Maui

 8  in its business?

 9          MR. SCOTT:  I'm sorry, how's that question worded

10  again?

11          MS. BARCOMB:  How many Jeeps are used by Maui in

12  its business?

13          MR. SCOTT:  Used by Maui, 15.

14          MS. BARCOMB:  Okay.  Are all 15 of those Jeeps

15  titled in your name?

16          MR. SCOTT:  No, ma'am.

17          MS. BARCOMB:  Okay, how many are in your name?

18          MR. SCOTT:  Ten are in my name and Tammi's name.

19  And five are in Tammi's name and the company's name.

20          MS. BARCOMB:  Okay.

21          MR. BAKER:  Alicia, those are specifically listed

22  on each of the individual filings, along with -- and they

23  all each tie to the lenders.

24          MS. BARCOMB:  Okay, great.  Thank you.

25          Do either you individually or does the business

1   own any real property?

2           MR. SCOTT:  No, ma'am.

3           MRS. SCOTT:  No.

4           MS. BARCOMB:  Okay.  On the business's Schedules,

5   I do see a priority tax claim to the Internal Revenue

6   Service with an amount listed as unknown.  What does that

7   relate to?

8           MR. SCOTT:  We have -- on the business's tax memo?

9           MS. BARCOMB:  Correct.

10          MR. SCOTT:  The business is up-to-date on the

11  taxes.  I don't think we have any unknown taxes due at this

12  point.

13          MS. BARCOMB:  Okay.

14          MR. SCOTT:  All of our federal taxes are paid up.

15  I don't believe there's any other business tax debt.

16          MS. BARCOMB:  Okay.  What about personally?  Do

17  you have any personal IRS --

18          MR. SCOTT:  Personally, yes, ma'am we had a --

19  personally, yes, ma'am, we had an audit a couple years ago.

20  We still owe some money on.  I don't remember that exact

21  amount.  It might be on my file.

22              Is it not on my file or on our personal files?

23          MS. BARCOMB:  I'm just asking of what your

24  knowledge is of that personal tax debt.

25          MR. SCOTT:  Oh, I apologize.  I think it's

1  somewhere in the neighborhood of 20,000 -- 15 to 20,000,

2  somewhere in that range.

3          MS. BARCOMB:  Okay.  And was that for failure to

4  report income or what resulted in that?

5          MR. SCOTT:  I guess you can call it that.  I had a

6  misunderstanding on our -- we did a 401k early withdraw to

7  buy our house and I thought that I read that that was exempt

8  and we did not include it in our taxes.  So there was a -- I

9  don't know it was $40-50,000 that we took out that we had to

10  pay taxes on and that changed our tax brackets and

11  everything and made a big mess.

12          MS. BARCOMB:  Okay.

13          MR. SCOTT:  I no longer do our taxes.  The

14  accountant does.

15          MS. BARCOMB:  Did you say that you took an early

16  401k withdrawal to buy a house; is that correct?

17          MR. SCOTT:  That's correct, yes, ma'am.

18          MS. BARCOMB:  Okay, when was that?

19          MR. SCOTT:  Oh, boy, seven years ago.

20          MRS. SCOTT:  Seven to eight years ago, yeah.

21          MS. BARCOMB:  Okay, so did you purchase the house

22  about seven years ago?

23          MR. SCOTT:  Yes, ma'am.

24          MS. BARCOMB:  Okay, and when did you sell that

25  house?

1          MR. SCOTT:  Six to seven.  We sold it right before

2     we went to Maui.  So we sold it three years ago.

3          MS. BARCOMB:  Okay.  So the vehicles that you and

4     Mrs. Scott drive here in Texas, what vehicles are those?

5          MR. SCOTT:  So my wife has a 2017 GMC Arcadia.

6     It's financed by the company and her through TD Auto

7     Finance.  My personal truck is still in Hawaii.  I have not

8     gotten permission to ship it back yet from First Hawaiian

9     Bank so it's still sitting there.  I don't have a vehicle

10    here personally yet.

11         MS. BARCOMB:  Okay.  Do you-all intend to exempt

12    those vehicles?

13         MR. SCOTT:  It was originally our intention, but

14    I'm just not 100 percent sure at this point.  If that's

15    okay.  I'm not sure if that's okay or not.

16         MS. BARCOMB:  I think -- did you say your wife had

17    a 2019 GMC Arcadia; is that right?

18         MR. SCOTT:  2017.

19         MS. BARCOMB:  2017 Arcadia?

20         MR. SCOTT:  Yes.

21         MS. BARCOMB:  Okay, and what truck do you drive,

22    Mr. Scott?

23         MR. SCOTT:  Mine is a 2018 Chevrolet Silverado.

24    And these are on the Schedules as well.  And it's financed

25    with Personal Land Bank.

1          MRS. SCOTT:  But that one is still on Maui.  It's

2   not here --

3          MS. BARCOMB:  I understand.

4          MRS. SCOTT:  -- in Texas

5          MS. BARCOMB:  Okay.  Are there any other

6   professionals that will be hired in this case?

7          MR. BAKER:  Yes, we'll probably be filing in a day

8   an application to hire Robert Norris (phonetic).  He's an

9   accountant.

10          MS. BARCOMB:  Okay.  Are there any other motions

11   that I need to be made aware of in this case?

12          MR. BAKER:  We'll probably file a motion on the

13   bank accounts.  Other than that, I'm not aware of any.  I

14   don't think that there are any cash collateral issues

15   because I've looked through with Mr. Scott all the loan

16   documents for the Jeeps and there's -- and as far as we can

17   tell there's nothing in there that gives any liens or any

18   interest at all on the rental proceeds from the Jeeps.

19          MS. BARCOMB:  Okay.

20          MR. BAKER:  Nor anything else that has any (glitch

21   in the audio).

22          MS. BARCOMB:  Okay.  Mr. Scott, do you understand

23   the requirement to file Monthly Operating Reports for both

24   cases?

25          MR. SCOTT:  I do, yes, ma'am.

1          MS. BARCOMB:  Okay, who will be preparing those

2    reports?

3          MR. SCOTT:  Bob Norris.

4          MS. BARCOMB:  Okay.  And Mr. Scott, do you

5    understand that the Subchapter Five Trustee's fees will be

6    paid from the Debtors' estates?

7          MR. SCOTT:  Yes, ma'am.

8          MS. BARCOMB:  Okay.  All right.  I think that's

9    all the questions I have now.  I'll reserve any questions if

10   I have any follow-up from others.

11         So what I'll do now is I'll just go through the

12   list to see if anybody has any questions for the Debtors.

13         Ms. Macanelli (phonetic), do you have any

14   questions?

15         MS. MACANELLI:  Yes, I have one.

16         MS. BARCOMB:  Okay, go ahead.

17         MS. MACANELLI:  Where -- have you-all changed the

18   car titles or are they as they were originally registered

19   when they were purchased?

20         MR. SCOTT:  Same as original registration when

21   they were purchased.

22         MS. MACANELLI:  So they're registered to Texas --

23   to TEDCU the vehicles that are financed through TEDCU, are

24   those still registered in Texas?

25         MR. SCOTT:  I'm sorry.  No, I apologize.  They're

1  registered in Hawaii, but they're still registered under the

2  same name of the same way they were titled, but they are

3  registered in Hawaii now.  They are in Hawaii.

4          MS MACANELLI:  Can you clarify that?

5          MR. SCOTT:  Yes, I'm sorry.  They're registered in

6  the same exact names they were before, but they are

7  registered now in Hawaii.  The Jeeps are in Hawaii.  They

8  are registered in Hawaii.

9          MS. MACANELLI:  So you've retitled the vehicles in

10  Hawaii?

11          MR. SCOTT:  No, ma'am.  We haven't titled

12  anything.  You have the title.  We have changed the

13  registration to Hawaii.  They are still titled the exact

14  same way they were when we purchase them.

15          MS. MACANELLI:  Okay.  That's the only question I

16  have.

17          MS. BARCOMB:  Okay, thank you.

18          Ms. Byman, do you have any questions for the

19  Debtors?

20          THE TRUSTEE:  I do have a couple.

21          MS. BARCOMB:  Okay.

22          THE TRUSTEE:  Mr. and Mrs. Scott, have you

23  received any notifications from any creditors regarding a

24  motion to lift stay or a request for surrender of the

25  vehicle despite the bankruptcy?

1          MR. SCOTT:  We have gotten a couple surrender

2    letters, but they -- when I call them, they won't take my

3    information for the case and everything, one of them.  But

4    they have quit calling, so maybe they finally took the

5    information.  But we did have a couple.

6          THE TRUSTEE:  Okay.  And with respect to the shut

7    down of Maui and really no tourism, did you-all apply for

8    and/or receive any PPP or other pandemic relief?

9          MR. SCOTT:  We did.  Both the EID and the PPP.

10   And we've included those as insufficient.

11         THE TRUSTEE:  And would you seek forgiveness of

12   either?

13         MR. SCOTT:  Did we seek -- we did not.  We didn't

14   have any payroll for that period, so we could not.

15         THE TRUSTEE:  Okay, so the payroll started

16   post-petition?

17         MR. SCOTT:  Correct.  Almost right after.

18   Correct.

19         THE TRUSTEE:  Okay.  I think you kind of answered

20   this before, but I just want to kind of explore them.

21   (indiscernible) bankruptcy in terms of complaining, I don't

22   want you to tell me what you talked to your lawyer about.

23         But I am curious why you wanted to try the

24   reorganization instead of surrendering the cars based on,

25   you know, the debt being more than they're worth and just

1  starting over when Maui was back up and running.

2      MR. SCOTT:  Surrendering the cars would have left

3  us without business.  The cars are the business, the Jeeps.

4      THE TRUSTEE:  Okay.  And right now, I mean, how is

5  business looking on a day-to-day basis?  Are you having

6  customers each day, several a day?

7      MR. SCOTT:  We are mostly -- so we only have 15

8  Jeeps.  And most people come and rent them for a week at a

9  time.  So we only have a capacity to do a couple a day.  But

10  yeah, we're probably about I would say right now currently

11  probably 70-80 percent booked up, which is pretty well for

12  right now.

13      THE TRUSTEE:  Yeah, that's very good.  Okay, and

14  then how far out --

15      MR. SCOTT:  We had to go through a crisis to get

16  to that level, but we obtain some pretty decent revenue.

17      THE TRUSTEE:  Okay.  And what does it look like in

18  terms of how far out are you booked up?

19      MR. SCOTT:  Through the end of the year we're

20  pretty booked right now.  I would say over 70 percent, 60 to

21  70 percent through the end of the year.

22      The holidays in Hawaii are the major, major

23  tourism dates.

24      THE TRUSTEE:  Okay.  Are there efforts -- I mean,

25  are there any leased vehicles that you think would be better

1   suited to sell and just purchase something new or do you

2   think all are worth keeping to reorganize the business?

3          MR. SCOTT:  I think they're definitely all worth

4   keeping.  They're also 18 or newer with less than 40,000

5   miles, so they're all worth keeping.

6          THE TRUSTEE:  Okay.  You said less than 40,000?

7          MR. SCOTT:  All of them, yes, ma'am.

8          THE TRUSTEE:  Okay.  I mean, as we talked about at

9   the initial Debtor interview, I mean, my role essentially is

10  to kind of assist at this point in ways that I can.  I'm

11  trying to help you-all with a consensual plan.

12         Do you anticipate any delay in getting your plan

13  filed by the required date?

14         MR. SCOTT:  The only thing that would mess up our

15  plan or anything going forward is Hawaii shutting down.

16  That would obviously, you know, throw a wrench in it for us.

17  But so long as they don't shut down again, you know, we've

18  got vaccines coming and treatments coming, so.  So long as

19  they don't shut down again, I see us doing just fine.

20         If they do, you know, that's something -- that's

21  the scary part that we just don't know.  That the world just

22  don't know.  It's what the heck is going to happen next

23  week, next month, next year.  We're very optimistic.

24         THE TRUSTEE:  Sure.  In terms of plan filing, I

25  know at the status conference you-all talked about probably

1  filing your two personal -- the personal, individual cases,

2  one plan and combining that with the business plan.  Is that

3  still the strategy you-all are looking at?  So it would be

4  one plan of reorganization?

5          MR. SCOTT:  I think one total plan.  I'll refer to

6  Reese, as well, but I think we can put everything together

7  in one plan that'd be great for the business and personal

8  because it's all -- it's all the same, you know, title stuff

9  for us.

10          THE TRUSTEE:  On your individual case, the rental

11  where you were living in Hawaii, is there money still owed

12  on that or were you able to break the lease with no damages?

13          MR. SCOTT:  No, ma'am, we were able to break the

14  lease with no damages.  The lady that was there before us

15  wanted to come back, so it worked out perfect for us.

16          THE TRUSTEE:  Oh, very good.  Okay.

17          Okay, those are all my questions.

18          MS. BARCOMB:  Thank you.

19          I did have some follow up questions that I want to

20  ask.

21          Mr. Scott, I see on your statement of income in

22  the personal case, that both you and Mrs. Scott are -- have

23  a salary of 2,500 each.  Is that coming from the business,

24  the Maui business?

25          MR. SCOTT:  It is, yes, ma'am.

1          MS. BARCOMB:  Okay, when did you-all start

2   receiving those salaries?

3          MRS. SCOTT:  First, October 31st.

4          MR. SCOTT:  Was the first paycheck we received was

5   on the 31st.  Then it was for a partial payment.  It was

6   like a one week paycheck.

7          MRS. SCOTT:  One week, yeah.

8          MS. BARCOMB:  The 31st, October 31st of this year?

9          MR. SCOTT:  Yes, ma'am.  Sorry, October 31st this

10  year.

11         MS. BARCOMB:  Okay, so just recently started

12  receiving that salary, correct?

13         MRS. SCOTT:  Yes.

14         MR. SCOTT:  That's correct.  Just as soon as the

15  island opened back up, we (indiscernible) you know, have

16  income.  We went back to work.

17         MS. BARCOMB:  Okay, so I understand that the

18  business was formed in December 2017, went operational, I

19  think you said, January of 2018; is that correct?

20         MR. SCOTT:  Yes, ma'am.

21         MS. BARCOMB:  Okay, so thinking about let's say

22  2019, did either you or Mrs. Scott receive any income from

23  the business?

24         MR. SCOTT:  We did.  We're an S-corp and we filed

25  our S-corp late so we didn't actually have W-2 paychecks.

1   But our -- oh, my goodness, what's the official word for

2   that?  The owner's discretionary income was over $200,000.

3           MS. BARCOMB:  Okay.

4           MR. SCOTT:  Plus I think we had 37,000 in income

5   that we reported through the taxes.

6           MS. BARCOMB:  All right.  And do you know when you

7   stopped receiving income from the business?

8           MR. SCOTT:  Somewhere around March-April.  Right

9   in the -- you know, right about the time we ran out of

10  money.  Honestly I guess maybe May, somewhere in there.

11          MRS. SCOTT:  Oh, stopped receiving income for

12  ourselves.

13          MS. BARCOMB:  Correct.

14          MR. SCOTT:  You're talking about personally?

15          MS. BARCOMB:  Yes, personally.

16          MRS. SCOTT:  Yeah, that was correct.

17          MR. SCOTT:  So somewhere around that -- by May-ish

18  I would say at the latest.  It could have been before that

19  for sure.

20          MRS. SCOTT:  I think it was more like the end of

21  March, very beginning of April because income just stopped.

22  You know, tourism stopped.  Nobody was renting Jeeps.

23  People were canceling their reservations and wanting their

24  money back.

25          MR. SCOTT:  I'm saying second quarter, second

1 quarter this year.

2      MS. BARCOMB:  Okay.  So is there any reason in the

3 business bankruptcy why those distributions or I think you

4 call it discretionary income to both you and your wife are

5 not listed in the Statement of Financial Affairs?

6      MR. SCOTT:  I didn't know that it needed to be

7 possibly.  It was before -- I think, wasn't there like a six

8 period we had to put out or something like that?

9      MS. BARCOMB:  So one of the questions refers to a

10 90-day period.  Which I believe -- your operations were shut

11 down for the 90 days prior to filing.

12      But there is a period of one year before the

13 filing that for payments made that benefit an insider.  And

14 I'm curious why that income wasn't listed as a payment that

15 benefited an insider.

16      MR. SCOTT:  I may have missed -- not noticed --

17 now that's 200,000 wasn't made in this year.  It was made

18 all throughout last year.  But I would have to double look.

19 I'm sorry I might have overlooked something.  I didn't do

20 anything on purpose for sure.  But I may have misunderstood

21 or overlooked something.

22      MS. BARCOMB:  Okay.  Mr. Baker, would you please

23 look into that a little further and amend the SOFA, if

24 necessary?

25      MR. BAKER:  Yes, we'll do that.

1          MS. BARCOMB:  Thank you.

2          The other thing that I wanted to follow up on that

3    Ms. Byman asked about was the loans received as a result of

4    the pandemic.

5          I see here that the US Small Business

6    Administration is listed for $150,000 as an EID loan.  I

7    believe you also testified that you received a PPP loan.

8          MR. SCOTT:  Correct.

9          MS. BARCOMB:  Did you list the PPP loan in here?

10   Is it just under a different name?  Oh, I see it now.  Never

11   mind don't answer that.

12         MR. SCOTT:  Bank of Hawaii, number one, yes.

13         MS. BARCOMB:  Yeah, I see that.  Sorry.  Okay.

14         MR. SCOTT:  Bank of Hawaii originated it for the

15   SBA, so.

16         MS. BARCOMB:  Perfect.  Thank you.

17         All right and last question that I have is why is

18   there no gross revenue listed for the calendar year of 2018?

19         MR. SCOTT:  There probably should be.  We were in

20   business.  We made 300-and-some-thousand or we took in

21   300-and-some-thousand that year.

22         MS. BARCOMB:  Okay.  I'll just note that as a

23   necessary amendment then to the Statement of Financial

24   Affairs, as well.

25         Okay.  All right, I think that's all the follow up

 1  questions that I have.  Just to allow everybody an

 2  opportunity to ask any other follow up questions.

 3           Ms. Macanelli, do you have any other questions?

 4           MS. MACANELLI:  No, I'm fine, thank you.

 5           MS. BARCOMB:  Thank you.

 6           Ms. Byman, did you have any other questions?

 7           THE TRUSTEE:  I do.  I just have one.

 8           Regarding the business cases, you just talked

 9  about some plans of payment kind of setting in and tourism

10  was shutting down.  Clients were asking for refunds.  Were

11  you able to refund all business or all of those requests or

12  are there still some creditors that could not receive a

13  refund?

14           MR. SCOTT:  To my knowledge, everybody has been

15  refunded that asked for one at this point.  We had some

16  refunds, we had some credit card disputes.  We let all the

17  credit card disputes go through.  We didn't dispute any of

18  them.  We really honestly couldn't dispute any of them.

19           So I believe everybody has been paid back.

20           THE TRUSTEE:  Okay, thank you.

21           MS. BARCOMB:  Okay, Mr. Baker, is there anything

22  else that you wanted to put on the Record today?

23           MR. BAKER:  I have forwarded to you the

24  certificate with standing for Maui and also all the

25  insurance information with the US Trustee on it.

1          MS. BARCOMB:  Excellent.  Thank you very much.

2          MR. BAKER:  But other than that --

3          MS. BARCOMB:  I see that now.  Thank you.

4          All right.  If there's nothing else to put on the

5   Record here today, I will conclude this 341 meeting.  All

6   parties are excused and have a Happy Thanksgiving.

7        (Meeting adjourned at 11:53 a.m.)

8                          *  *  *  *  *

9          *I certify that the foregoing is a correct*

10  *transcript to the best of my ability due to the condition of*

11  *the electronic sound recording of the ZOOM/telephonic*

12  *proceedings in the above-entitled matter.*

13  */S/ MARY D. HENRY*

14  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

15  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

16  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

17  *JTT TRANSCRIPT #63405*

18  *DATE:  FEBRUARY 7, 2021*

19

20

21

22

23

24

25